IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                             No. CR 15-3553 JB

JAMES VANCE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence Based on Invalid Traffic Stop, filed December 30, 2015 (Doc. 25)("Motion"). The Court held a hearing on February 16, 2016. The primary issue is whether the Court should suppress methamphetamine obtained from Defendant James Vance's vehicle during a traffic stop pursuant to the Fourth Amendment to the Constitution of the United States of America, because the police officer stopped Vance based on a mistaken understanding of a traffic law. The Court will deny the Motion, because the facts here support reasonable suspicion to stop for a traffic violation.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a

judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Raddatz, 447 U.S. 667, 679 (1980)(noting that "the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself"); United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)("The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)[1]("We need not resolve whether Crawford[ v.

---

[1]United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that United States v. Garcia, United States v. Cunningham, 630 F. App'x 873 (10th Cir. 2015), and United States v. Alabi, 597 F. App'x 991 (10th Cir. 2015) have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

<u>Washington</u>, 541 U.S. 36 (2004)]'s[2] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"); <u>United States v. Merritt</u>, 695 F.2d at 1269; <u>United States v. Davis</u>, 361 F. App'x 632, 636 (6th Cir. 2010)("Davis further claims that by disallowing cross-examination of McLaughlin and Pantall, Judge Economus violated his rights under the Confrontation Clause. This claim also lacks merit."); <u>United States v. Christy</u>, No. 10-1534, 2011 WL 3933868, at *2 (D.N.M. Sept. 2, 2011)(Browning, J.)("Thus, the Court may consider hearsay in ruling on a motion to suppress."); <u>United States v. Hernandez</u>, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that <u>Crawford v. Washington</u> does not apply to detention hearings").

  1. On September 18, 2015, Vance was driving east on Interstate 40 near mile marker 145 in a rented Toyota Corolla.  <u>See</u> Motion at 1 (asserting this fact); Transcript of Hearing at 9:6-20 (taken February 16, 2016)(Wishard)("Tr.")(asserting the same fact).[3]

  2. This stretch of I-40 covers a long hill and has three eastbound lanes to allow drivers to pass semi-trucks without impeding traffic.  <u>See</u> Motion at 1 (asserting this fact); Tr. at 12:20-25 (Rael)(asserting the same fact).

---

[2]<u>Crawford v. Washington</u> decided that out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify, and the defendant had a previous opportunity to cross-examine the witness.  <u>See</u> 541 U.S. at 53-54.

[3]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version; any final version may contain slightly different page and/or line numbers.

3.     As Vance reached the hill's top, he was traveling in the center lane at the posted speed limit.  See Tr. at 13:1-8 (Rael)(asserting this fact); Motion at 1 (asserting the same fact as to the speed limit).[4]

4.     Vance, using his turn signal, moved into the left lane to pass a vehicle in the center lane.  See Tr. at 13:1-3 (Rael).

5.     Vance then engaged his turn signal and "darted" from the left lane to the right lane, without pausing in the center lane.  Tr. at 13:3-6 (Rael).

6.     Vance could not have adequately determined whether his lane change could be made with safety, because a white passenger vehicle blocked his view.  See Tr. at 14:1-3 (Davis, Rael).

7.     The car that Vance passed did not have to brake, and the lane he entered was unoccupied.  See Tr. at 13:3-9 (Davis, Rael).

8.     Detective D. Rael, a Bernalillo County Sherriff's Department officer, was following Vance in a marked official Sports Utility Vehicle when Vance made the lane change.  See Motion at 1-2.

---

[4]The parties presented different accounts of the events leading up to the traffic stop in their briefing and at the hearing.  Vance asserts that he was driving in the right lane, overtook a car in the center lane, and then switched from the right lane to the left lane without stopping in the center lane.  See Motion at 1-2; Transcript of Hearing at 3:11-18 (Davis), taken February 16, 2016 ("Tr.").  Detective D. Rael, on the other hand, asserts that Vance was driving in the center lane, moved into the left lane to pass another vehicle, and then moved to the right lane without stopping in the center lane.  See Tr. at 13:1-8 (Rael).  The Court has reviewed both accounts several times, and concludes that Rael's account is more credible.  Rael provides a detailed description of his situation and the surrounding traffic before Vance's lane change.  See Tr. at 12:4-13:8 (Rael).  Although he was not directly behind Vance during the lane change, he was close enough to observe it.  See Tr. at 14:18-24 (Rael).  Finally, his account is internally consistent.  Vance has a far more powerful incentive to misrepresent the events.

9.     Detective Rael decided that the lane change violated N.M. Stat. Ann. § 66-7-317, and pulled Vance over.  <u>See</u> Motion at 2 (asserting this fact); Response at 2 (asserting the same fact).

10.     Rael's report cited Vance's failure to stop between two lanes as the reason for the citation.  <u>See</u> Tr. at 26:19-27:5 (Davis)(asserting this fact); Response (not disputing this fact).

11.     Rael issued a warning citation for the lane change, but then asked Vance for permission to continue to speak with him.  <u>See</u> Motion at 2 (asserting this fact); Response at 2 (asserting the same fact).

12.     Vance noticed the smell of marijuana emanating from the vehicle.  <u>See</u> Response at 2 (asserting this fact); Reply at 1-5 (not disputing this fact).

13.     Rael sought and obtained written consent to search Vance's vehicle.  <u>See</u> Motion at 2 (asserting this fact); Response at 2 (not disputing this fact).

14.     The search located methamphetamine in the trunk and in the driver's side door. <u>See</u> Motion at 2 (asserting this fact); Response at 2 (asserting the same fact).

## PROCEDURAL BACKGROUND

On October 7, 2015, a grand jury indicted Vance for possession with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). <u>See</u> Indictment at 1 (dated October 7, 2015), filed October 7, 2015 (Doc. 12).

Vance moves to suppress "any and all evidence, and the fruits thereof, seized as a result of the traffic stop in this matter on September 18, 2015."  Motion at 1.  He argues that his lane change did not violate § 66-7-317's plain text or any other traffic laws.  <u>See</u> Motion at 3-4.  He notes that the Court must undertake a two-part inquiry: "first, was the officer's actions justified in its inception and, second, was the officer's actions reasonably related to the circumstances

of the initial stop."   Motion at 3 (citing U.S. v. DeGasso, 369 F.3d 1139 (10th Cir. 2004)).

Vance explains that, in this case, the United States cannot establish that the officer's action

was justified, because it was based on a mistaken understanding of the law.   See Motion at 3

(citing United States v. Bassols, 775 F. Supp. 2d 1293, 1298-99 (D.N.M. 2011)(Parker, J.)("If an

officer reasonably, but incorrectly, believes either that a defendant's conduct violated a statute or

that a statute justified a traffic stop, the stop is invalid.").   Vance concludes that "the stop was

invalid and the evidence seized, therefore, should be suppressed."   Motion at 4.

        The United States responded on February 8, 2016.   See United States' Response to

Defendants' Motion to Suppress, filed February 8, 2016 (Doc. 30)("Response").   The United

States argues that "[a]n officer's reasonable mistake of law can support a finding of reasonable

suspicion to conduct a lawful traffic stop under the Fourth Amendment."   Response at 3 (citing

Heien v. N. Carolina, 135 S. Ct. 530, 534 (2014)).   It concedes that Rael's interpretation of the

law was mistaken, but argues that his interpretation need not be perfect.   See Response at 3.   It

explains that the mistake was reasonable, because "statutes that pose 'a really difficult or very

hard question of statutory interpretation' lend credence to the conclusion that the officer made a

reasonable mistake of law."   Response at 4 (quoting Heien v. N. Carolina, 135 S. Ct. at 541

(Kagan, J., concurring)).   The United States also argues that the Supreme Court of the United

States' decision in Heien v. North Carolina overruled the Honorable James Parker, United States

District Judge for the District of New Mexico's decision in United States v. Bassols.   See

Response at 4.

        Vance replied on February 11, 2016.   See Defendant's Reply to the United States'

Response to Defendant's Motion to Suppress, filed February 11, 2016 (Doc. 33)("Reply").

Vance acknowledges that Heien v. North Carolina "clearly changes the analysis" applicable to

his Motion.  Reply at 1.  He thus argues that Rael's mistake of law is not objectively reasonable.

See Reply at 2.  He notes that: (i) although there is no state appellate authority on point, its

absence is because the statute's plain language is clear; and (ii) the statute does not contain any

ambiguity.  See Reply at 2 (citing United States v. Alvarado-Zarza, 782 F.3d 246, 250 (5th Cir.

2015)("First, the statute contained at least some ambiguity because it referenced 'rear lamps'

multiple times.   Second, the state's appellate courts had not previously addressed the issue.")).

He explains that the statute is clear: "A lane change is authorized so long as it's done safely.

There is no language indicating a pause in a lane change is required before making a further lane

change."  Reply at 2.  He adds that Rael should know the elements of the traffic laws which he

enforces, because he is "an experienced officer."  Reply at 3.

        The Court held a hearing on February 16, 2016.  See Tr. at 1:22-24 (Court).  The parties

initially agreed that the relevant facts were not in dispute.  See Tr. at 2:24-1 (Davis)("I think Mr.

Wishard and I pretty much stipulate to the pertinent facts of the case. . . ."); id. at 7:13-14

(Wishard)("We don't think there is a factual dispute.").  Vance contrasted two recent cases.  See

Tr. at 4:13-5:7 (Davis).   In United States v. Cunningham, 630 F. App'x 873 (10th Cir.

2015)(unpublished), Vance explains, a defendant exited a motel parking lot without signaling,

but the statute plainly required a signal only when a driver entered a private parking lot.  See Tr.

at 4:16-19 (Davis)(citing United States v. Cunningham, 630 F. App'x at 878).  The statute also

contained a residual clause requiring a signal when "otherwise turn[ing] a vehicle from a direct

course or mov[ing] left or right upon a roadway."  Tr. at 4:21-25 (Davis)(citing United States v.

Cunningham, 630 F. App'x at 878).  The Tenth Circuit concluded that the residual clause was

sufficiently ambiguous to support the officer's judgment that the defendant violated the statute.

See Tr. at 4:25-5:2 (Davis).  Vance then compared United States v. Cunningham with United

- 7 -

States v. Alvarado-Zarza, in which a police officer stopped a defendant for "not signaling 100 feet in advance of a turn when he wasn't making a turn he was simply making a lane change." Tr. at 5:5-7 (Davis).   Vance described United States v. Alvarado-Zarza as a case with an unambiguous statute, calling it similar to his own case.  See Tr. at 5:7-10 (Davis).  He explained that, because his lane change was performed in a safe manner, the statute did not cover it.  See Tr. at 6:25-7:6 (Davis).

The United States began by withdrawing its concession that there was a violation, arguing that "Detective Rael observed a traffic violation."  Tr. at 8:20-25 (Wishard).  It stated that there was a vehicle in Lane No. 2 -- the center lane -- when Vance took two lanes at the same time.  See Tr. at 9:6-10:1 (Wishard).  It argued that this vehicle's presence made the lane change unsafe and justified a traffic stop.  See Tr. at 9:24-10:1 (Wishard).

Rael testified:

> Mr. Vance was in the number 2 lane and went around another vehicle by using his blinker, getting in the Number 1 lane, and then proceeding back, using his blinker again into the number two lane.  But he didn't stop in the number 2 lane.  He actually darted across to the number 3 lane.  The problem with this is, as he's passing the other vehicle, he can never establish a safe travel into the number 3 lane.

Tr. at 13:1-8 (Rael).  He added that Vance likely could not see "the right lane, the furthest right lane which is the number 3 lane to establish whether it was clear or not because he had just passed a vehicle."  Tr. at 13:15-22 (Rael).  He thus concluded that "the likelihood is that he could not see" his blind spot.  Tr. at 14:1-3 (Rael).  He described the vehicle blocking Vance's view as "a white passenger vehicle," but could not identify the make or model.  Tr. at 14:18-19 (Rael).

Vance first established on cross-examination that he was driving at the proper speed limit and that he properly used his signal.  See Tr. at 15:22-16:7 (Davis, Rael).  Rael agreed that the

car that Vance passed did not have to brake and that the lane he entered was unoccupied.  See Tr. at 17:3-9 (Davis, Rael).  In response to questions from the Court, Rael indicated that he stopped Vance under § 66-7-317(a).  See Tr. at 19:23-20:3 (Court, Rael).

The United States indicated that its Heien v. North Carolina argument -- that Rael's mistake was objectively reasonable -- was now a fallback position and that its primary argument was that Vance made an unsafe lane change.  See Tr. at 21:1-13 (Court, Wishard).  The United States agreed with the Court's suggestion that the statute did not prevent motorists from crossing more than one lane at a time.  See Tr. at 21:14-23 (Court, Wishard).  In response to questioning from the Court, the United States conceded that, if the lane change was safe, "we wouldn't have been here."  Tr. at  23:19-24:10 (Court, Wishard).  The United States nonetheless argued that Heien v. North Carolina was still relevant, explaining that, even if Vance did not violate the statute, "the officer's subjective understanding" of the safety law was objectively reasonable.  Tr. at 24:22-25:4 (Wishard).

Vance then attacked the United States' new theory:

> I find that it just strains credulity that the Court could find that based on the officer's testimony that there was a violation of law.  It's purely speculative from the detective standpoint as to what Mr. Vance had seen or done before he made those lane changes.  What we do know is that he was going the speed limit.  At all times he executed his turn signals correctly.  [A]t no time did he cut off any vehicle.  This vehicle that Mr. Wishard has indicated was the third intervening vehicle in this scenario there was no, he didn't cut that car off and that the lane that he ultimately took was open the entire time.  Being 150 meters back the officer isn't really in a position to see.

Tr. at 26:13-27:1 (Davis).  Vance also noted that Rael's report cited Vance's failure to stop between two lanes as the reason for the citation.  See Tr. at 26:19-27:5 (Davis).  Vance agreed with the Court that the United States' argument made Heien v. North Carolina irrelevant to the outcome.  See Tr. at 27:13-18 (Court, Davis).  The Court suggested that the outcome instead

rested on Rael's credibility.  See Tr. at 27:19-20 (Court).  Vance disagreed, but added that there

was not sufficient evidence to Rael's claimed basis for the stop: "Otherwise, anytime another

vehicle passes a car in that scenario, engages their turn signal and doesn't stop in the number 2

lane then that's a violation of law, and I just don't think that's correct. That can't be the law."

Tr. at 27:22-28:3 (Davis).

> The Court then summed up its inclination:
>
> Well, I guess when I came in here, I thought we were dealing with a [Heien v. N.
> Carolina] problem.  And I guess I was a little bit skeptical that this was
> objectively reasonable interpretation of that law.  It just didn't seem to violate[] it.
> But I guess I'm sort of thinking I'm confronted really with a situation that's not a
> [Heien v. N. Carolina] problem at all.  I've got to decide whether this, the facts
> here support [reasonable] suspicion to stop for a violation. Let me give this some
> thought.  I guess I'm inclined to think that it does, and that the motion should be
> denied.  But I want to give it a little more thought.

Tr. at 29:15-30:1 (Court).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

Fourth Amendment rights are enforceable against state actors through the Due Process Clause of

the Fourteenth Amendment to the Constitution of the United States.  See Mapp v. Ohio, 367 U.S.

643, 655 (1961); United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir.

2008)("[T]he Fourth Amendment applies against state law enforcement officials as incorporated

through the Due Process Clause of the Fourteenth Amendment.").  "Not all searches require a

warrant.  The hallmark of the Fourth Amendment is reasonableness."  United States v. Harmon,

785 F. Supp. 2d at 1157.  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir.

2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  (quoting

Brigham City v. Stuart, 547 U.S. 398 (1978))).  The Supreme Court has stated that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)("Katz")(footnotes omitted).

### 1.    Whether a Fourth Amendment Search Occurred.

A court cannot suppress evidence unless the search was a Fourth Amendment search.  A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information.  See United States v. Jones, 132 S. Ct. at 947.  "[T]he Katz reasonable-expectation-of-privacy test has been *added to,* not *substituted for,* the common-law trespassory test."  United States v. Jones, 132 S. Ct. at 947 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165 (1969); Soldal v. Cook Cty., 506 U.S. 56, 64 (1992)).

### a.    Katz v. United States' Reasonable-Expectations-of-Privacy Analysis.

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"  Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. at 174).  "A district court cannot suppress evidence unless the movant proves that a search implicates *personal* Fourth Amendment interests."  United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).  "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'"  United States v. Miller,

425 U.S. 435, 440 (1976)(quoting <u>Hoffa v. United States</u>, 385 U.S. 293, 301-02 (1966)).  The

Tenth Circuit has, thus, noted that "[a]n illegal search or seizure only harms those with legitimate

expectations of privacy in the premises searched."  <u>United States v. Jones</u>, 44 F.3d at 871 (citing

<u>United States v. Roper</u>, 918 F.2d 885, 886-87 (10th Cir. 1990)).  Thus, "[t]he proper inquiry" to

determine whether a search implicates a defendant's Fourth Amendment interests still depends,

after conducting a trespass-based analysis, on "whether the defendant had an expectation of

privacy in the place searched and whether that expectation was objectively reasonable."  <u>Kerns v.</u>

<u>Bd. of Comm'rs</u>, 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.), <u>abrogated on other</u>

<u>grounds as recognized in</u> <u>Ysasi v. Brown</u>, 2014 WL 936835, at *9 n.24.

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a

search subject to the Fourth Amendment."  <u>Illinois v. Caballes</u>, 543 U.S. at 409 (quoting <u>United</u>

<u>States v. Jacobsen</u>, 466 U.S. at 123).  The Supreme Court has, thus, recognized that, rather than

determining whether law enforcement conduct was a search, it sometimes proves easier to

"assess[] when a search is not a search."  <u>Kyllo v. United States</u>, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse
> the principle first enunciated in <u>Katz v. United States</u>.  <u>Katz</u> involved
> eavesdropping by means of an electronic listening device placed on the outside of
> a telephone booth -- a location not within the catalog ("persons, houses, papers,
> and effects") that the Fourth Amendment protects against unreasonable searches.
> We held that the Fourth Amendment nonetheless protected Katz from the
> warrantless eavesdropping because he "justifiably relied" upon the privacy of the
> telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a
> Fourth Amendment search occurs when the government violates a subjective
> expectation of privacy that society recognizes as reasonable.

<u>Kyllo v. United States</u>, 533 U.S. at 32-33.  The Supreme Court, thus, articulated the <u>Katz</u> rule --

which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable

expectation of privacy' test," Wayne R. LaFave, <u>Search and Seizure: A Treatise on the </u>Fourth

Amendment § 2.1(b), at 435 (4th ed. 2004) -- which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" United States v. Jones, 132 S. Ct. at 951.  See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").  In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439 U.S. at 143 & n.12.  Although ownership or lawful possession is not determinative under the Katz reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession." United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i.      Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when he or she "has shown that 'he sought to preserve something as private.'"  Ysasi v. Brown, 2014 WL 936835, at *8 (quoting Bond v. United States, 529 U.S. at 338).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  "[T]he Fourth Amendment

protects people, not places.  What a person knowingly exposes to the public . . . is not a subject

of Fourth Amendment protection."  Katz, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the
> obtaining of information revealed to a third party and conveyed by him to
> Government authorities, even if the information is revealed on the assumption that
> it will be used only for a limited purpose and the confidence placed in the third
> party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do

not always coincide with the interests that the Fourth Amendment is universally thought to

protect.  In Smith v. Maryland, for instance, the Supreme Court identified situations in which it

would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would
> provide an inadequate index of Fourth Amendment protection.  For example, if
> the Government were suddenly to announce on nationwide television that all
> homes henceforth would be subject to warrantless entry, individuals thereafter
> might not in fact entertain any actual expectation or [sic] privacy regarding their
> homes, papers, and effects.  Similarly, if a refugee from a totalitarian country,
> unaware of this Nation's traditions, erroneously assumed that police were
> continuously monitoring his telephone conversations, a subjective expectation of
> privacy regarding the contents of his calls might be lacking as well. In such
> circumstances, where an individual's subjective expectations had been
> "conditioned" by influences alien to well-recognized Fourth Amendment
> freedoms, those subjective expectations obviously could play no meaningful role
> in ascertaining what the scope of Fourth Amendment protection was.   In
> determining whether a "legitimate expectation of privacy" existed in such cases, a
> normative inquiry would be proper.

Smith v. Maryland, 442 U.S. at 740 n.5.  Most recently, in United States v. Jones, Justice

Sotomayor commented that, given the reality of technology in the twenty-first century, it may no

longer be sound to universally hold to the third-party disclosure rule to determine whether a

subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no
> reasonable expectation of privacy in information voluntarily disclosed to third
> parties.  This approach is ill suited to the digital age, in which people reveal a
> great deal of information about themselves to third parties in the course of
> carrying out mundane tasks.  People disclose the phone numbers that they dial or
> text to their cellular providers; the URLs that they visit and the e-mail addresses
> with which they correspond to their Internet service providers; and the books,
> groceries, and medications they purchase to online retailers.  Perhaps, as Justice
> Alito notes, some people may find the "tradeoff" of privacy for convenience
> "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and
> perhaps not. I for one doubt that people would accept without complaint the
> warrantless disclosure to the Government of a list of every Web site they had
> visited in the last week, or month, or year.  But whatever the societal expectations,
> they can attain constitutionally protected status only if our Fourth Amendment
> jurisprudence ceases to treat secrecy as a prerequisite for privacy.  I would not
> assume that all information voluntarily disclosed to some member of the public
> for a limited purpose is, for that reason alone, disentitled to Fourth Amendment
> protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(citations omitted).  The Court notes, however, that,

regardless what the Supreme Court decides to do with social media on the internet, only the most

ignorant or gullible think that what they post on the internet is or remains private.  See United

States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(holding that a person posting to

his Facebook profile had "no justifiable expectation that his 'friends' would keep his profile

private").

### ii.  Privacy Expectation That Society Is Prepared to Recognize as Reasonable.

Under the second step of Katz' reasonable-expectation-of-privacy approach, courts must

determine "whether society is prepared to recognize that [subjective privacy] expectation as

objectively reasonable."  United States v. Ruiz, 664 F.3d 833, 838 (10th Cir. 2012)(United States

v. Allen, 235 F.3d 482, 489 (10th Cir. 2000)).  The Supreme Court has cautioned: "The concept

of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature,

critically different from the mere expectation, however well justified, that certain facts will not

come to the attention of the authorities."  United States v. Jacobsen, 466 U.S. 109, 122 (1984).

"Determining whether society would view the expectation as objectively reasonable turns on

whether the government's intrusion infringes on a legitimate interest, based on the values that the

Fourth Amendment protects."    United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M.

2013)(Browning, J.)(citing California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of

legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but

instead "whether the government's intrusion infringes upon the personal and societal values

protected by the Fourth Amendment")), aff'd, 597 F. App'x 991 (10th Cir. 2015)(unpublished).

This second factor of Katz' reasonable-expectation-of-privacy analysis developed from Justice

Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that

eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably

relied while using the telephone booth.'"  LaFave, § 2.1(d), at 439 (quoting Katz, 389 U.S. at

353).  Thus, whether society will recognize a certain expectation of privacy does not turn on

whether the hypothetical reasonable person would hold the same expectation of privacy, but

rather on whether the expectation of privacy is justified or legitimate.  The Supreme Court has

provided that, while no single factor determines legitimacy, whether society recognizes a privacy

interest as reasonable is determined based on our societal understanding regarding what deserves

protection from government invasion:

> No single factor determines whether an individual legitimately may claim under
> the Fourth Amendment that a place should be free of government intrusion not
> authorized by warrant.  In assessing the degree to which a search infringes upon
> individual privacy, the Court has given weight to such factors as the intention of
> the Framers of the Fourth Amendment, the uses to which the individual has put a
> location, and our societal understanding that certain areas deserve the most
> scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). In United States v. Place, 462 U.S. 696 (1983), the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment." 462 U.S. at 707. The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it. See 462 U.S. at 699. The drug-sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine. See 462 U.S. at 699. While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could identify only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.
>
> In these respects, the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that

the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

United States v. Place, 462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine.  See 466 U.S. at 122-24.  A Federal Express employee and supervisor opened a damaged package, and exposed four zip-lock plastic bags containing 6 and one-half ounces of white powder.  See 466 U.S. at 111.  They then called the Drug Enforcement Administration ("DEA") and repacked the contents in the original packaging before they provided the package to the DEA officers.  See 466 U.S. at 111.  When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine.  See 466 U.S. at 111-12.  The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

> The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search.  It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted).  The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment."  United States v. Jacobsen, 466 U.S. at 122.  The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?

. . . .

A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest. Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

. . . .

Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place, and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[5] The Supreme Court reasoned that the dog sniff in Illinois

---

[5]The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes. Of the current Supreme Court Justices,

v. Caballes fell squarely in line with the series of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at], governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interests.'"   543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).   The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'" 543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122).   The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search.  Kyllo v. United States, 533 U.S. 27 . . . (2001) . . . .  Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath."  Id., at 38 . . . .  The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car.  A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants."  943 F. Supp. 2d at 1275.  The Court reluctantly

---

Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp. 2d at 1280.  The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ."  943 F. Supp. 2d at 1281.  Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals."  United States v. Alabi, 943 F. Supp. 2d at 1287.  The Tenth Circuit later affirmed the Court's decision.  See United States v. Alabi, 597 F. App'x 991, 995 (10th Cir. 2015).

### b.  **Trespass-Based Analysis**.

In Florida v. Jardines, the Supreme Court explained that the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a

constitutional violation." United States v. Jones, 132 S. Ct. at 951 n.5 (Scalia, J.)(emphasis

omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).  In determining whether a

search has occurred, "[t]respass alone does not qualify, but there must be conjoined with

that . . . an attempt to find something or to obtain information."  United States v. Jones, 132 S.

Ct. at 951 n.5.  The Supreme Court has also noted that "[p]hysically invasive inspection is

simply more intrusive than purely visual inspection."  Bond v. United States, 529 U.S. 334, 337

(2000).  Moreover, the Supreme Court, in Florida v. Jardines, suggested that the trespass-based

analysis applies only when the trespass occurs in one of the four places or things listed in the

Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things
> encompassed by its protections": persons, houses, papers, and effects. The Fourth
> Amendment does not, therefore, prevent all investigations conducted on private
> property; for example, an officer may (subject to Katz) gather information in what
> we have called "open fields" -- even if those fields are privately owned -- because
> such fields are not enumerated in the Amendment's text . . . .  But when it comes
> to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. 170, 176 (1984) and Hester v.

United States, 265 U.S. 57, 59 (1924)).

In United States v. Alabi, the Court analyzed whether the Secret Service's digital scan of

electronic information contained in the defendants' credit and debit cards' magnetic strips was a

Fourth Amendment search under a trespass-based analysis, concluding that it was not, because

the Secret Service properly possessed the credit and debit cards, and the additional act of

scanning the cards to read the virtual data contained on the strips did not involve a physical

intrusion or physical penetration of space.  See 943 F. Supp. 2d at 1264-65.  The Court noted

that, "[e]ven if the Supreme Court were to extend the trespass-based analysis for Fourth

Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one

credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area.  943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip. Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in *their* persons, houses, papers, and effects . . . ."  U.S. Const. amend IV.

943 F. Supp. 2d at 1273 (omission in case but not in quoted source)(emphasis in case but not in quoted source).

c.      <u>Katz</u>' Reasonable-Expectation-of-Privacy Test <u>Remains Good Law</u>.

The Court has noted that, in light of the Supreme Court's recent decisions in <u>Florida v. Jardines</u> and <u>United States v. Jones</u>, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the <u>Katz v. United States</u> reasonable-expectation-of-privacy test is still good law."  <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1242 (citing <u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)).  Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the <u>Katz</u> test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in <u>Katz</u> . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'"

- 23 -

bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable.  When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has *occurred* (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment.  That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'"  Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the *Constitution* would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

Minnesota v. Carter, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(citations omitted).  In both United States v. Jones and Florida v. Jardines, however, Justice Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for Katz' reasonable-expectation-of-privacy analysis.  Rather, his majority opinions asserted that Katz' reasonable-expectation-of-privacy analysis added to the trespass-based analysis.  See Florida v. Jardines, 133 S. Ct. at 1417 ("The Katz reasonable-expectations test 'has been *added to,* not *substituted for,*' the traditional property-based understanding of the Fourth Amendment." (emphasis in original)(quoting United States v. Jones, 132 S. Ct. at 952)).  The Court concluded in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the Katz v. United States reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach." 943 F. Supp. 2d at 1243.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure." 133 S. Ct. at 1980.  Justice Scalia criticized the majority opinion for analogizing DNA testing to

taking an arrestee's photograph by citing to <u>Katz</u> and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'"

<u>Maryland v. King</u>, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in his or her body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee."  But why are the "privacy-related concerns" not also "weighty" when an intrusion into the *body* is at stake? (The Fourth Amendment lists "persons" *first* among the entities protected against unreasonable searches and seizures.).

<u>Maryland v. King</u>, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphases in original)(citations omitted).  Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school.  Perhaps the construction of such a genetic panopticon is wise.  But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

<u>Maryland v. King</u>, 133 S. Ct. at 1989 (Scalia J., dissenting).  The Court, therefore, concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until after he runs the facts through the trespass prong.

## 2.     **Traffic Stops.**

To show that a car search implicates the defendant's personal Fourth Amendment interests, "the defendant bears the burden of showing that he had a legitimate possessory interest

in or [a] lawful control over the car."   United States v. Valdez Hocker, 333 F.3d 1206, 1209 (10th Cir. 2003)(internal quotation marks and citation omitted)(alteration in original).   "Because the focus of the inquiry is on reasonable expectations, however, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself." United States v. Valdez Hocker, 333 F.3d at 1209 (citation omitted).   The Tenth Circuit has held the following criteria "important[ ] though not determinative" in determining whether a defendant has standing to assert a violation of his Fourth Amendment rights based on the search on objects inside a vehicle: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle."   United States v. Parada,  577 F.3d 1275, 1280 (10th Cir. 2009)(quoting United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000))(internal quotation marks omitted).

"'A traffic stop is a 'seizure' within the meaning of the Fourth Amendment . . . .'" United States v. Holt, 264 F.3d 1215, 1220 (10th Cir. 2001)(en banc), holding modified on other grounds by United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007)(quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).   "For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers."   United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)). "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's."   United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004)(unpublished)(citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)).   "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop."   United States v.

- 26 -

White, 584 F.3d at 945.    Passengers may challenge their detention during traffic stops.  See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000), and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d at 1500)).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart."  United States v. Erwin, 875 F.2d at 270.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 131 S. Ct. 1849, 1856 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220 (quoting Terry v. Ohio, 392 U.S. at 20)).  "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . . regulations of the jurisdiction."  United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation . . . ."  United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005)(citation and internal quotation marks omitted).

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause

or reasonable suspicion.[6]  See United States v. Holt, 264 F.3d at 1230.  A court must examine "both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'" United States v. Wilson, 96 F. App'x at 644 (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)).

"A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009).  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation . . . ."

---

[6] The Tenth Circuit in United States v. King, 990 F.2d 1552 (10th Cir. 1997), noted: "Terry was the first case to recognize that 'the Fourth Amendment governs 'seizures' of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty."  990 F.2d at 1557 (internal citations omitted)(quoting Terry v. Ohio, 392 U.S. at 16, 27).  Thus, Terry v. Ohio

> has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557 (internal citations omitted)(citing United States v. Sokolow, 490 U.S. at 7; Adams v. Williams, 407 U.S. 143, 147-48 (1972)).

United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005)(citation and internal quotation marks omitted).

### 3.    **Consensual Searches**.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(quotations, alterations, and citations omitted).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010); United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law-enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

<u>**ANALYSIS**</u>

Rael had reasonable suspicion to stop Vance's vehicle, because he made an unsafe lane change in violation of N.M. Stat. Ann. § 66-7-317. By darting from the left lane directly into the right lane, Vance could not have checked his blind spot for cars remaining in the right lane. Given the Court's conclusion, the parties' dispute over <u>Heien v. North Carolina</u>'s application to this case is irrelevant.

Rael properly initiated a traffic stop, because Vance's driving violated § 66-7-317. Section 66-7-317 states, in relevant part:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
>
> A.      a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety;

N.M. Stat. Ann. § 66-7-317(A). The Court concludes that Rael's testimony is credible. Vance "darted" from the left lane to the right lane after passing another vehicle, and could not have seen around that vehicle to determine whether the right lane was clear. Tr. at 13:3-6 (Rael). Vance failed to adequately ensure that the right lane was unoccupied. <u>See</u> Tr. at 13:23-14:3 (Rael, Wishard). He thus violated § 66-7-317(A)'s prohibition on moving a vehicle from a lane "until the driver has first ascertained that such movement can be made with safety." N.M. Stat. Ann. § 66-7-317(A). That Vance used his signal and drove at the speed limit does not render his lane change safe, as many drivers involved in side-swiping collisions can attest. <u>See</u> Tr. at 15:22-16:7 (Davis, Rael). That the lane Vance entered was unoccupied is not dispositive -- conduct need not result in a collision to constitute unsafe driving. <u>See</u> Tr. at 17:3-9 (Davis, Rael). Because Vance

- 31 -

violated § 66-7-317(A), Rael properly initiated the stop, and the Court need not exclude evidence obtained as a result of the stop.

The parties' original dispute over Heien v. N. Carolina is irrelevant, because Rael made no mistake as to the applicable law.  See 135 S. Ct. at 534.  The Court notes, however, that the United States lacked a viable argument at the briefing stage.  Although state appellate courts have not interpreted § 66-7-317 on this issue, there is no language in the statute that prohibits motorists from changing two lanes at once.  The statute, in short, neither poses "a really difficult or very hard question of statutory interpretation," Heien v. N. Carolina, 135 S. Ct. at 541, nor contains "at least some ambiguity" that could support an objectively reasonable mistake of law, United States v. Alvarado-Zarza, 782 F.3d at 250.

**IT IS ORDERED** that the Defendant's Motion to Suppress Evidence Based on Invalid Traffic Stop, filed December 30, 2015 (Doc. 25), is denied.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Damon P. Martinez
   United States Attorney
Jacob Wishard
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Michael V. Davis
Corrales, New Mexico

   *Attorney for the Defendant*

- 32 -